GAIL EVELYN MCDANIEL *vs.* SAMUEL C. PICKENS.

No. 96-P-1602.

Worcester. January 14, 1998. - June 12, 1998.

Present: PORADA, KAPLAN, & BECK, JJ.

*Negligence,* Doctor, Expert opinion. *Medical Malpractice,* Expert opinion. *Witness,* Expert, Bias, Cross-examination. *Evidence,* Insurance, Cross-examination, Expert opinion, Bias.

In a medical malpractice action, the judge incorrectly excluded all reference to liability insurance that could have been offered to prove bias on the part of expert witnesses [65-67], however, where the plaintiff did not demonstrate that the ruling harmed her case, which was not strong, the error was harmless [67-69].

CIVIL ACTION commenced in the Superior Court Department on April 14, 1992.

The case was tried before *James P. Donohue,* J.

*David A. Wojcik* for the plaintiff.

*Robert V. Deiana* for the defendant.

KAPLAN, J. This medical malpractice action was initially against both Dr. Robert B. Shepherd and Dr. Samuel Pickens, defendants.

On April 19, 1989, Gail McDaniel, plaintiff, went to the Barre Family Health Center at Barre (a department of Holden Hospital) where she was seen by Dr. Shepherd, a resident in the tenth month of his first year of residency.[1] The plaintiff was suffering from pains in her groin. She also pointed to a "pea-sized lump" on the left side of her neck. On finding such a "prominence" in the large neck muscle, Dr. Shepherd consulted with Dr. Pickens (associate medical director of the Barre Center), one of the four attending physicians at the Center who

---

[1]Dr. Shepherd's three-year family practice residency was at the University of Massachusetts Medical Center, Worcester. He worked one day a week at the Barre Center.

was then available. The two agreed to have the prominence diagnosed by means of X-ray and blood testing, with possible referral to an ear, nose, and throat (ENT) specialist. The X-ray and other tests proved normal. The plaintiff returned to Dr. Shepherd on April 27 and May 9 for attention to the pains in her groin. On those occasions the neck lump was present but not enlarged. At the May 9 visit, Dr. Shepherd told the plaintiff to return if "it changed at all, if she had any new symptoms." We pass over later measures taken to resolve the groin problem.

A year later, on May 17, 1990, the plaintiff did return. The neck lump had suddenly grown much larger, as Dr. Shepherd observed. At Dr. Shepherd's request, Dr. Pickens examined the mass. Further exploration was indicated. An ENT specialist made a "needle" biopsy. It was inconclusive, as was a CAT scan. In July, 1990, the plaintiff underwent an excisional lymph node biopsy. This showed that the plaintiff had non-Hodgkins lymphoma. The cancer had invaded the whole lymph system and bone marrow. For six months commencing August, 1990, the plaintiff underwent chemotherapy. In February, 1991, the cancer was in remission and this condition continued through the time of trial in November, 1995.

At trial, it was conceded on the part of the defense that proper medical care in the circumstances would not have consisted merely of leaving the plaintiff's return for follow-up of the neck lump to the plaintiff's judgment about whether the lump had changed. Rather the physician should make sure that the plaintiff was seen within two months or so[2] of the last visit. Thus Dr. Shepherd was at fault for not conforming to the proper standard of care. In the course of the defendants' presentation of their case at trial, Dr. Shepherd was dismissed from the action: he had reached a settlement with the plaintiff. This left Dr. Pickens as sole defendant.

The plaintiff charged that Dr. Pickens had behaved negligently in that he had not himself seen to the earlier appearance of the plaintiff for reexamination. Dr. Pickens replied that as an attending physician advising a resident he was not under an independent duty to see to the timely return of the patient; he could and had properly relied on the resident (whom he thought well of) to assure the patient's attendance.

If Dr. Pickens were found negligent, then the question of

---

[2]Dr. Pickens mentioned one or two months, Dr. Shepherd three to six months.

"causation" would arise. The plaintiff charged that the lapse of the twelve months without attention to the neck lump had been detrimental to her. Dr. Pickens responded that because of the intrinsic nature of the disease, the characteristic "waxing and waning" course of its development, and the methods of treatment, it was medically indifferent that the patient was not treated earlier in the interval of time.

The matter was tried on both issues through the medical records and the testimony of plaintiff, defendants, and medical experts, and passed to the jury on special questions. The jury answered the first question, was Dr. Pickens negligent, in the negative; accordingly, the question of causation was not reached, and judgment entered in Dr. Pickens' favor. The plaintiff appeals.

1. The plaintiff argues that the trial judge erred in unduly restricting her counsel's cross-examination of the defendants' experts to attempt to establish their bias.

The matter of cross-examining experts for bias was discussed in the morning just before trial began in connection with plaintiff's subpoenas to produce and defendants' motions to exclude evidence about the selection and compensation of defendants' medical experts. The upshot was a ruling by the judge, in effect, that cross-examination about malpractice insurance or insurers would not be allowed; to permit such questioning, he said, would be "unfair." He said, however, that he would not "handcuff" counsel and would allow reasonable cross-examination of experts in other ways on the subject of bias.

The question of cross-examination for bias obtruded again during trial. Dr. David E. Nicklin, an expert on family practice, testifying as plaintiff's only expert, described on direct the fee he was charging in the present case (this, however, would go to the University of Pennsylvania of which he had become a salaried employee in 1994). In cross-examination, defense counsel elicited that Dr. Nicklin had come into the case through "MedQuest," an organization which arranged ("brokered") matches between lawyers and physicians acting as experts. Dr. Nicklin also said that about ninety percent of his fifty retainers as expert since 1990 were on the side of plaintiffs.[3] Plaintiff's counsel did not object to this questioning.

[3]On redirect, Dr. Nicklin said his work as expert was but a small fraction of his total active practice and of the four cases, other than the present case, in

Later, when plaintiff's counsel was cross-examining Dr. David S. Rosenthal, an oncologist, appearing as an expert for Dr. Shepherd, a reference to malpractice insurance slipped in. Upon defendant's objection, the judge said the reference was unnecessary and he would charge the jury that insurance had no place in the lawsuit. Plaintiff's counsel argued vehemently, renewing his argument at the pretrial, that he should not be barred the route of showing an expert's bias through the expert's connection with the liability insurance; especially should such examination be allowed here, he said, in order to "level the playing field" after the unobjected-to questioning of the plaintiff's expert on his relation to MedQuest. The judge held to his ruling and promptly instructed the jury as indicated.[4]

The judge was mistaken in his understanding of the law. The legal position is stated briefly in rule 411 of the Federal Rules of Evidence (the same as the proposed Massachusetts rule 411 and reflective of existing practice):

> "*Liability Insurance.* Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness."

Thus evidence of liability insurance is firmly barred when offered in medical malpractice cases to prove that a defendant physician did or did not act negligently: this is because of the weakness of the inferential connection, see *Jamison* v. *A. M. Byers Co.*, 330 F.2d 657, 661-662 (3d Cir.), cert. denied, 379 U.S. 839 (1964). On the other hand, there is a clear right of litigants to attempt to prove bias in derogation of witnesses'

which he had appeared to testify, he appeared for the plaintiff in two cases, and for the defendant in two.

[4]In further cross-examination of Dr. Rosenthal, plaintiff's counsel asked him when he received the records in this case for review, how much time he spent on this case, and what rates he charged. Counsel asked whether the witness had been retained for defendants in other cases; answer, he didn't make a living doing this; he made about $1,000 to $1,500 a year every couple of years; he received the fees from law firms, either plaintiffs' or defendants'. Did he generally testify for the defendants; answer, he acted for either the plaintiffs or defendants.

testimony in malpractice as in other cases, see *Dempsey* v. *Goldstein Bros. Amusement Co.*, 231 Mass. 461, 464 (1919); *Commonwealth* v. *Ahearn*, 370 Mass. 283, 286-287 (1976); Liacos, Massachusetts Evidence §§ 4.7, 6.8.1-2 (6th ed. 1994), and here discretion is reserved to trial judges to oversee where needed the character and dimensions of the proof, see *MacCormack* v. *Boston Edison Co.*, 423 Mass. 652, 665 (1996), among other reasons to avoid undue prejudice or confusion. So in the case of expert witnesses in malpractice cases, a judge may be called upon to exercise discretion by weighing the probative value of the evidence to be elicited for the declared purpose of proving bias, against any untoward animus or confusion the evidence may engender, for instance, by the injection of the troubling rogue factor of insurance. See, applying State rules corresponding to rule 411, *Barsema* v. *Susong*, 156 Ariz. 309, 312-314 (1988); *Strain* v. *Heinssen*, 434 N.W.2d 640, 642-643 (Iowa 1989); *Lopez* v. *Southwest Community Health Servs.*, 114 N.M. 2, 12-13 (1992); *Reed* v. *Wimmer*, 195 W. Va. 199, 205-206 (1995). Suppose a defendant's expert in a particular malpractice action has appeared for numerous defendant physicians all insured by one or a group of liability insurers and expects further references from the same sources: a judge may admit such evidence as tending to prove the expert's biased mindset (with limiting instructions, probably, to guard against the jury's applying the fact of the insurance to the issue of the defendant physician's negligence or to other immediately extraneous matters). But where an expert has had no relation to any liability insurer apart from the fact that the defendant's insurer in the end footed his bill, a judge might decide to limit the cross-examination to exclude reference to the insurance altogether, and so avoid any collateral entanglements.

It follows that the trial judge in the present case acted incautiously when, as a per se proposition, without apprehending what the situation might turn out to be, he excluded all reference to liability insurance that might be offered in proof of an expert's bias — the exclusion announced at the threshold of the case and maintained throughout.

2. Granted the judge's mistake, how significant was it and how might the plaintiff be expected to react to it? Here we look first to the condition of the record about Dr. Pickens' alleged negligence in failing personally to assure the plaintiff's recall, the matter on which the action finally turned.

The plaintiff's own testimony was not impressive for her cause on this subject. In Dr. Nicklin's direct testimony for the plaintiff, he evidently assumed that the situation in Massachusetts was like that in Pennsylvania where he practiced, that is, he assumed the resident, Dr. Shepherd, was not fully licensed to practice medicine and was doing so under the shelter of Dr. Pickens' license (in Pennsylvania the resident would be acting under only a trainee's license). The incorrectness of this assumption was brought out forcefully in cross-examination by the defendant's counsel. There was little if any of the testimony of Drs. Shepherd and Pickens that would help materially to establish a duty on Dr. Pickens' part to arrange and monitor a schedule of appearances by the plaintiff.

Dr. John Santoro, an expert on family practice, who was Dr. Pickens' expert on the negligence question, delineated the relative functions of resident and attending physician, referring to his experience at Baystate Medical Center in Springfield, Massachusetts. He concluded that Dr. Pickens' conduct was unexceptionable. Defendant's counsel was at pains to anticipate a suggestion that Dr. Santoro was unduly biased: on direct examination Dr. Santoro said he had received the materials (medical records, etc.) in the case from the defendant's counsel who was then examining him; he had similarly reviewed other cases at the request of attorneys in malpractice cases; had done so three or four times a year, either for plaintiffs' attorneys or defendants' attorneys; since 1975 he had testified in court three or four times, and on deposition perhaps ten times; he spoke of the fees he charged.

The plaintiff's counsel cross-examined Dr. Santoro on the negligence issue with not more than moderate effect. He did not undertake to cross-examine the expert with respect to his possible bias.[5]

The action thus stood as at most a case for the jury on the negligence issue, but quite persuasive in favor of Dr. Pickens; and the bias question was left untouched by the plaintiff.

---

[5] Dr. Robert Shepard (not related to the defendant Shepherd), an oncologist, was also an expert for Dr. Pickens. On direct, after substantive testimony, he said he received the records in this case for review from the defendant's counsel; he had done the same for others, perhaps twice a year; had testified in court just once; and his fees were thus and so. As with Dr. Santoro, plaintiff's counsel cross-examined on substance, but chose not to examine about bias.

This abstention from inquiring, even within the area allowed by the judge's ruling, was very possibly intended as a gesture of protest against the judge's ruling. But we do not think the plaintiff could leave it at that. The plaintiff's precise grievance must be that the trial judge should not have "handcuffed" himself by his per se ruling; he should rather have exercised judgment about admitting references to insurance as the situation might warrant. But to preserve her position for appeal, the plaintiff had to demonstrate in some concrete way how she might have benefitted if the judge had been free of his ruling; and this meant offering evidence, on hand or procurable, suggestive of relationships between the experts and insurance that in sound judgment should or might have been admitted in proof of bias. The plaintiff at one point intimated, rather mysteriously, that there was an "intermediary" in the process of selecting defendants' experts. If she had, or had access to, tendentious evidence on the point leading somewhere, she should have indicated on the record what it was. See *Commonwealth* v. *Baker*, 348 Mass. 60, 63-64 (1964); *Breault* v. *Ford Motor Co.*, 364 Mass. 352, 357-358 (1973); *Commonwealth* v. *Caine*, 366 Mass. 366, 370 & n.4 (1974); *Commonwealth* v. *Ahearn*, 370 Mass. 283, 286 (1976). See also *Charter* v. *Chleborad*, 551 F.2d 246, 249 (8th Cir.), cert. denied, 434 U.S. 856 (1977); *Patton* v. *Rose*, 892 S.W.2d 410, 414 (Tenn. App. 1994) (an instance of a stipulated offer of facts inviting a ruling on admission). If it appeared that this evidence could be obtained only from the cross-examined expert himself, then the plaintiff could make a case for a voir dire: as an example of such use of a voir dire regarding witness bias in a malpractice case, see *Todd* v. *Andalkar*, 691 A.2d 1215, 1217 (Me. 1997). "[C]ounsel could have pursued the point, but he chose not to. . . . He was not entitled to secrete an error for use on appeal in case the verdict went against him." *Commonwealth* v. *Cheek*, 374 Mass. 613, 615 (1978).

We add that insistence on the plaintiff's making a fair showing seems particularly appropriate where, as indicated above, the evidence on the substantive issue of negligence weighed heavily in one direction and witness bias would have to be strongly demonstrated to tip the scale. See *Reed* v. *Wimmer*, 195 W. Va. at 209 (where case stands on merits to be considered in handling bias problem). Cf. Mass.R.Civ.P. 61, 365 Mass. 829 (1974) (harmless error); G. L. c. 231, § 119 (same).

This is not an occasion for entering upon the general question whether jurors have attained to such a level of sophistication that they can take insurance and related things in stride when properly instructed, and candor is to be preferred over a mask that sometimes doesn't work. See 23 Wright & Graham, Federal Practice and Procedure §§ 5361-5369 (1980). For purposes of the present case the whole debate may be overlooked.

*Judgment affirmed.*